**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| **WILLIAM MCDERMET,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **19-11322-FDS** |
| **v.** | ) | |
| | ) | |
| **DIRECTV, LLC, and** | ) | |
| **THE DIRECTV GROUP, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION TO STRIKE**

SAYLOR, C.J.

This is a lawsuit under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §

227.  Plaintiff William McDermet alleges that defendants DirecTV, LLC, and The DirecTV

Group, Inc., or their agents made telemarketing calls to him that violated the TCPA and

Massachusetts law.  McDermet, who is an attorney, is proceeding *pro se*.

The parties have filed cross-motions for summary judgment.  Defendants have also

moved to strike portions of McDermet's statement of facts and several attached exhibits.  For the

following reasons, defendants' motion to strike will be granted in part and denied in part;

defendants' motion for summary judgment will be granted; and plaintiff's motion for summary

judgment will be denied.

I.      **Background**

        A.      **Factual Background**

        William McDermet is a resident of Massachusetts and an attorney.  (*See* Pl. SF at 8; Pl.

Mem., Ex. 1 ("McDermet Aff.") at 2).  He has two phone numbers:  a residential landline and a

cellular line.  (McDermet Aff. ¶ 1).  He registered his landline with the National Do Not Call Registry in 2008 and his cell phone with the registry in 2010.  (*Id.*).

DirecTV, LLC provides satellite television services.  (Defs. Mem., Ex. 1 ("Haley Decl.") ¶ 5).  The DirecTV Group, Inc. is "a holding company in the chain of ownership for" DirecTV, LLC; it does not enter into contracts with any customers or provide any television services to them.  (Defs. Mem., Ex. 10 ("Phillips Decl.") ¶ 4).[1]

McDermet alleges that between February 2018 and July 2019 he received a total of 57 phone calls from telemarketers seeking to sell him satellite television services.  (McDermet Aff. ¶ 3).  He alleges that he received 28 of those calls on his cell phone and 29 on his landline.  (Pl. SF ¶¶ 2-3).  He further alleges that he recorded the calls and had transcripts of the recordings prepared by a transcription service.  (McDermet Aff. ¶ 5).[2]  He has submitted those transcripts as exhibits in support of his motion.  (*See* Pl. Mem., Exs. 3-59).

Several of the calls allegedly began with a prerecorded message.  (McDermet Aff. ¶ 6).  McDermet also alleges that "during some calls, [he] attempted to engage the caller, who did not respond, which evidences the fact that [it] was a recorded voice."  (*Id.*).  Similarly, the transcripts for other calls indicate that the caller began with a long message and then responded as if McDermet had spoken, even though he remained silent.  (*See, e.g.*, Pl. Mem., Exs. 3, 7).

McDermet further alleges that nearly all of the calls came from "spoofed numbers," meaning that he was unable to call back the number that appeared on his caller ID.  (Defs. Mem., Ex. 3 ("McDermet Dep.") at 53).

---

[1] For the sake of brevity, the Court will refer to DirecTV, LLC as DirecTV, and The DirecTV Group, Inc. as The DirecTV Group.

[2] McDermet stated in his affidavit that he recorded "all" of the calls, but he has represented elsewhere that he did not record one of them (#10).  (*Compare* McDermet Aff. ¶ 5, *with* Pl. SF ¶ 4).  That inconsistency is not material for present purposes.

On some of the calls, McDermet gave out fake names when the callers asked him for personal information.  (*See, e.g.*, Pl. Mem., Ex. 34 ("Gary Marks")).  He later received letters from DirecTV addressed to those fake names.  (*See, e.g.*, Pl. Mem., Ex. 60 ("Gary Marks")).

On many of the calls, McDermet asked the caller for his or her company's name and/or address.  (*See, e.g.*, Pl. Mem., Exs. 5, 8, 9, 12).  Sometimes, the caller did not respond to the question.  (*See, e.g.*, Pl. Mem., Exs. 5, 8).  On other occasions, the callers said they represented other companies that are not parties to this lawsuit, such as Charter Spectrum, "Satellite Television Service(s)," or "TV For Less."  (*See, e.g.*, Pl. Mem., Exs. 8, 12, 14).  Several times, the callers stated that they were calling "from DirecTV."  (*See, e.g.*, Pl. Mem., Exs. 4, 13, 15).

DirecTV has hired several companies to telemarket its services to consumers.  (Haley Decl. ¶ 6).  It provides those authorized telemarketers with contact information for potential customers.  (*See* Defs. Mem., Ex. 2 ("Bailey Aff.") ¶ 2).  It keeps searchable records of that contact information going back two years.  (*Id.*).  According to DirecTV, as of April 13, 2020, those records indicated that neither of McDermet's phone numbers "were included in any of the searchable authorized telemarketing lists."  (*See id.* ¶ 3).

Separately, DirecTV has contracts with "thousands" of independent third-party retailers, which it refers to as "authorized retailers."  (Haley Decl. ¶ 6).[3]  Authorized retailers "solicit subscriptions from residential and commercial customers in exchange for commissions and other compensation."  (*Id.*).  DirecTV keeps records of when they perform certain activities with a customer, such as checking his or her credit or placing an order.  (*Id.* ¶ 9; *see id.*, Ex. A).  A DirecTV employee searched those records for any such activities associated with McDermet, as

---

[3] Technically, the authorized retailers contract with AT&T Services, Inc., an affiliate of DirecTV.  (Haley Decl. ¶ 7; *see, e.g.*, Haley Decl., Exs. B-E).

well as the fake names he gave out.  (*Id.* ¶ 9).  That search showed that McDermet had interacted with four of DirecTV's authorized retailers:  Rogerio Diaspolicarpo, Whitesign Systems, Nuvision Communications, and AVD Solutions.  (*Id.* ¶ 10; *see id.*, Ex. A).

Each of those four authorized retailers marketed DirecTV's services under a contract with the company.  (*See* Haley Decl., Exs. B-E).  Each contract provides that the authorized retailer and DirecTV are "independent contracting parties," and that each company's employees or agents "are not employees or agents of the other party."  (Haley Decl., Exs. B-E at § 2.1.1).

The contracts also include a "Marketing Tactics Dealer Policy Statement."  (*See, e.g.*, Haley Decl., Ex. B at Schedule 1).  That statement requires them to "prominently identify themselves in all marketing" and prohibits them from "hold[ing] themselves out as an agent of AT&T or any AT&T Affiliate, including [DirecTV]."  (*See, e.g., id.*).  It also describes the federal laws that govern telemarketing and prohibits the authorized retailers "from outbound telemarketing of [DirecTV's] [s]ervices except via a manually placed return call or text message in response to a direct inquiry from a customer" that they "are able to substantiate."  (*See, e.g., id.*).  It further provides that "[t]he equipment used to place manual return calls" must "require some sort of human intervention to place/launch the call" and only allow one call at a time.  (*See, e.g., id.*).  And it provides that the equipment may not, now or in the future, have the "capacity to store and produce numbers and dial those numbers at random, in sequential order or from a database of numbers."  (*See, e.g., id.*).

DirecTV has submitted affidavits from each of its account managers who supervised the relationships with Diaspolicarpo, Whitesign Systems, Nuvision, and AVD Solutions.  (*See* Defs. Mem., Exs. 4 ("Salerno Aff."), 5 ("Loaiza Aff."), 6 ("Charles Aff.")).  Each states that the authorized retailers were "paid commissions" rather than paid "based on the time they spen[t]

4

marketing [DirecTV] products and services."  (Salerno Aff. ¶ 5; Loaiza Aff. ¶ 5; Charles Aff. ¶

5).  They also state that each authorized retailer "had other companies whose products [they]

sold."  (Salerno Aff. ¶ 6; Loaiza Aff. ¶ 6; Charles Aff. ¶ 6).  In addition, they represent that

DirecTV employees did not "oversee" or "manag[e] the day-to-day business" of the authorized

retailers, "control or oversee any calls" they made, require them to engage in any specific

marketing, provide them with any telephone numbers to call, or "control the hours or days" that

their employees worked.  (Salerno Aff. ¶¶ 8-15; Loaiza Aff. ¶¶ 8-15; Charles Aff. ¶¶ 8-15).

    **B.**    <u>**Procedural Background**</u>

       On February 11, 2019, McDermet sent a demand letter to DirecTV.  (Defs Mem., Ex. 7).

In that letter, he alleged that he had received several unsolicited phone calls from organizations

offering to sell him satellite television services.  (*Id.*).  He stated that "[d]uring some of these

calls" he had been "transferred to a person who indicated they were with" DirecTV.  (*Id.*).  He

alleged that DirecTV had violated both 47 U.S.C. § 227 and Mass. Gen. Laws ch. 159C.  (*Id.*).

He offered to settle and stated that if he did not receive a settlement offer within 32 days, he

would file suit.  (*Id.*).  The letter did not expressly mention Mass. Gen. Laws ch. 93A.  (*See id.*;

McDermet Dep. at 90).

       On May 17, 2019, McDermet filed this action in Massachusetts Superior Court.  On June

13, 2019, defendants removed the action to this Court, alleging federal-question jurisdiction

under 28 U.S.C. § 1331.  An amended complaint was filed on July 14, 2019.  It alleges two

counts against DirecTV and the DirecTV Group:  violations of the TCPA, 47 U.S.C. § 227

(Count 1); and violations of Mass. Gen. Laws chs. 159C and 93A (Count 2).  (Am. Compl. ¶¶

31-40).

       On April 27, 2020, both parties moved for summary judgment on a variety of issues.  On

May 18, 2020, defendants moved to strike several exhibits that McDermet had filed in support of

his motion for summary judgment along with portions of his statement of facts.

## II.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.     Motion to Strike

Because the disposition of the motion to strike will affect the evidentiary record, the Court will address it first.

On April 27, 2020, when McDermet filed his motion for summary judgment, he also submitted a statement of facts and attached transcripts of the 57 calls allegedly made by defendants.  (*See generally* Pl. SF; Pl. Mem., Exs. 3-59).  He represents that he recorded those

calls himself and had the transcripts prepared by a transcription service.  (McDermet Aff. ¶ 5).[4]

Defendants have moved to strike those transcripts and associated portions of McDermet's statement of facts.  They contend that (1) the transcripts are inadmissible hearsay and (2) McDermet violated Massachusetts law by making the underlying recordings.  They have also moved to strike other portions of his statement of facts on the ground that they are supported only by the allegations in his amended complaint.

### 1.  **Hearsay**

Defendants contend that the transcripts and associated portions of McDermet's statement of facts are hearsay.  (Defs. MTS at 2-3).  The transcripts clearly contain out-of-court statements—specifically, conversations between McDermet and whoever called him.[5] Defendants contend that McDermet has offered the callers' statements to prove that two assertions they made were true:  (1) that they were affiliated with DirecTV and (2) that they used an ATDS.  (*Id.* at 2).

It is clear that McDermet is offering the statements to prove the truth of their contents. For example, he contends that the fact that a "caller offered or confirmed that he was using an ATDS" is "evidence of the use of an ATDS."  (Pl. Mem. at 12-13).  Similarly, he contends that

---

[4] McDermet also attached transcripts of five calls that occurred after the filing of this case.  (*See* Pl. Mem., Exs. 64-68).  He concedes that these calls are "not included in this action," but offers them as evidence of defendants' use of an automatic telephone dialing system ("ATDS").  (*See* Pl. SF ¶¶ 27-29).  Because the calls are not included in this action, these exhibits and their corresponding paragraphs in the statement of facts will be excluded.

[5] The relevant portions of McDermet's statement of facts that defendants seek to strike assert only that the callers made those statements—not that they were true.  For example, paragraph 10 states that "[d]uring 32 of these calls, the caller *indicated* that he was calling from DirecTV."  (Pl. SF ¶ 10 (emphasis added)).  Similarly, paragraph 23 says only that a "caller *stated* that the calls were 'made automatically.'"  (*Id.* ¶ 23 (emphasis added)).  The other paragraphs that defendants have moved to strike are couched in similar terms.  (*See id.* ¶¶ 8, 12-18, 20, 24, 28). Essentially, all of those paragraphs merely reproduce excerpts of the callers' statements; whether those excerpts are offered to prove the truth of the matter asserted depends on the purpose for which McDermet seeks to use them.

"the transcripts of these calls provide overwhelming evidence that these telemarketers were acting on behalf of DirecTV," because the callers said so.  (*Id.* at 9).

McDermet contends that any statements by the callers are outside the definition of hearsay under Fed. R. Evid. 801(d)(2).  (Pl. Opp. at 2-3).  Specifically, he contends that the callers (1) were defendants' agents and (2) were speaking "on a matter within the scope of that relationship and while it existed."  Fed R. Evid. 801(d)(2)(D).  He bears the burden to prove both contentions.  *Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc.*, 344 F.3d 22, 29 n.5 (1st Cir. 2003).

At least on this record, he has not carried that burden.  He relies on two types of evidence to demonstrate that the callers were defendants' agents:  (1) the callers' statements that they were calling from DirecTV and (2) two letters from DirecTV addressed to fake names he gave out on the calls.  (Pl. Opp. at 2).  As to the first, a statement by the callers may "not by itself establish . . . the existence or scope of [an agency] relationship."  Fed R. Evid. 801(d)(2).  And as for the letters, the fact that the callers sold defendants' services does not necessarily show that they were defendants' agents.  *See W.R. Const. & Consulting, Inc. v. Jen-Wen, Inc.*, 2002 WL 31194870, at *4-5 (D. Mass. Sept. 20, 2002).  Moreover, and as set forth in greater detail below, the undisputed evidence establishes that the callers were not acting within the scope of their actual or apparent authority when they called McDermet.

McDermet further contends that even if the callers' statements are hearsay, they are admissible under Fed. R. Evid. 804.  (Pl. Opp. at 3-4).  However, even assuming that the callers qualify as "unavailable" under Rule 804(a), he has not shown that any of the exceptions in Rule 804(b) apply.  He contends that defendants have "wrongfully caused" the callers' unavailability as witnesses by either arranging for them to make telemarketing calls to the United States from

call centers in foreign countries, or by "construct[ing] a system of telemarketing which is so layered as to place the actual callers beyond the reach of the courts . . . by design." (*Id.*); *see* Fed. R. Evid. 804(b)(6). But he has not produced any evidence that defendants actually prevented him from identifying the callers, let alone that they "intend[ed] that result." *See* Fed R. Evid. 804(b)(6). To the contrary, it appears that they tried to help him identify and locate the callers. (*See* Defs. Mem., Ex. 8).

Accordingly, the transcript exhibits and the corresponding statements of fact that rely on those transcripts may be used only for non-hearsay purposes and will be struck to the extent the statements at issue are used to prove the truth of the matters asserted.

### 2.      Alleged Violations of Mass. Gen. Laws ch. 272 § 99(C)

Defendants further contend that the transcripts and all statements of fact that rely on them should be struck because the underlying recordings were obtained illegally. (Defs. MTS at 4-5). Specifically, they contend that McDermet violated Mass. Gen. Laws ch. 272, § 99(C)(1) by recording the callers without their consent and Mass. Gen. Laws ch. 272, § 99(C)(3) by disclosing or using those recordings when he submitted them as evidence in this proceeding. (*Id.*).

Even if defendants are correct that McDermet obtained and disclosed the recordings illegally, that is not a sufficient basis to strike them or the corresponding statements of fact. If he indeed recorded the callers illegally or has used those recordings unlawfully, that "might give rise to a criminal prosecution, or a civil suit" brought to vindicate the callers' state-law privacy rights. *See London-Sire Recs., Inc. v. Doe 1*, 2009 WL 10728828, at *2 (D. Mass. Jan. 9, 2009) (internal citations omitted) (citing in part Mass. Gen. Laws ch. 272, § 99). "Those, not exclusion of evidence, are the proper deterrents." *Doe 1*, 2009 WL 10728828, at *2. Accordingly, neither the transcripts nor McDermet's statements of fact will be struck on that basis.

### 3.   Citations to the Amended Complaint

Finally, defendants contend that several paragraphs in McDermet's statement of facts should be struck because they are supported only by citations to his amended complaint.  (Defs. MTS at 5).[6]  Some of those paragraphs also cite to record evidence—specifically, the transcripts, which will not be wholly struck for the reasons set forth above.  (*See, e.g.*, Pl. SF ¶¶ 17-18, 20, 23-24).  But others are indeed supported only by citations to the amended complaint.  (*See* Pl. SF ¶¶ 6-7).

"The complaint is not admissible evidence and is not an appropriate source of authority for purposes of summary judgment."  *Reed v. LePage Bakeries, Inc.*, 2000 WL 761626, at *1 n.2 (D. Me. Feb. 29, 2000); *see Anderson*, 477 U.S. at 256-57.  It is true that a verified complaint may be "treated as the functional equivalent of an affidavit" and thus as admissible evidence. *See Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 93 n.9 (1st Cir. 2018) (quoting *Sheinkopf v. Stone*, 927 F.2d 1259, 1262 (1st Cir. 1991)).  But here, the amended complaint is not verified; McDermet has simply signed it and failed "expressly to attest to the truth of the allegations therein."  (*See generally* Am. Compl.); *see Perry v. Ryan*, 1991 U.S. App. LEXIS 7098, at *5, 940 F.2d 646 (1st Cir. Apr. 3, 1991).

The affidavit McDermet submitted with his motion for summary judgment on April 27, 2020, did not refer to the amended complaint.  But the affidavit he submitted with his opposition to defendants' motion for summary judgment on May 18, 2020, states:  "I hereby declare, under the pains and penalties of perjury, that the facts stated in this affidavit, the previously filed Complaint and First Amended Complaint, and the Previously filed Statement of Facts are

---

[6] They also contend that any arguments in his briefing that rely on those paragraphs should be struck. (Defs. MTS at 5).

personally known to me, and that they are true."  That was filed on the same day as defendants'

motion to strike.  Under the circumstances, the Court will treat the May 18 affidavit as having

verified the factual allegations in the amended complaint, and thus those allegations will be

considered part of the evidentiary record.  In any event, whether the relevant paragraphs are

struck or not does not affect the disposition of the summary judgment motions.

Accordingly, the allegations in the amended complaint, and paragraphs 6 and 7 of

McDermet's statement of facts, will not be struck.

### B.  Motions for Summary Judgment

#### 1.  TCPA Claims

Congress enacted the TCPA in 1991 after determining that "[m]any consumers [were]

outraged over the proliferation of intrusive, nuisance calls . . . from telemarketers."  47 U.S.C. §

227 note, Pub. L. No. 102-243, § 2(6)-(7).

One way that the TCPA regulates telemarketing calls is by prohibiting the use of

automated calling systems.  Section 227(b)(1)(A) makes it "unlawful . . . to make any call (other

than a call made for emergency purposes or made with the prior express consent of the called

party) using any automatic telephone dialing system . . . to any telephone number assigned to

a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii).  "In short, the TCPA generally

makes it unlawful to call a cell phone using" an ATDS.  *ACA Int'l. v. FCC*, 885 F.3d 687, 693

(D.C. Cir. 2018).  Similarly, it prohibits calling cell phones or residential landlines using "an

artificial or prerecorded voice."  47 U.S.C. §§ 227(b)(1)(A)(iii), 227(b)(1)(B).

The TCPA also provides for the creation of a national do-not-call registry.  Section

227(c) authorizes the Federal Communications Commission ("FCC") to create rules "to protect

residential telephone subscribers' privacy rights."  *See id.* § 227(c). The FCC's implementing

regulations make it unlawful, among other things, to "initiate any telephone solicitation to" a

11

"residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry."  47 C.F.R. § 64.1200(c)(2).  That includes cell phone owners who "may participate in the national do-not-call list."  *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14039 (2003); *see also* 47 CFR § 64.1200(e).

Here, McDermet alleges that defendants violated the TCPA and its implementing regulations by (1) calling both phone numbers despite their inclusion on the national do-not-call registry, (2) calling his cell phone number using an ATDS, and (3) calling both phone numbers using an artificial or prerecorded voice.  (Am. Compl. ¶¶ 32-35).

The parties have cross-moved for summary judgment on the TCPA claims.  Defendants contend that McDermet cannot show (1) that either they or their agents made the calls or (2) that whoever made the calls to his cell phone used an ATDS.  McDermet contends that defendants are liable as principals for any TCPA violations committed by their authorized retailers and that the evidence in the record establishes that those retailers used an ATDS.

### a.     Whether the Callers Acted as DirecTV's Agents

As set forth above, the TCPA makes it unlawful to "make" or "initiate" a telemarketing call under certain circumstances.  *See, e.g.*, 47 U.S.C. §§ 227(b)(1)(A)-(B).  Here, it is undisputed that defendants did not themselves make or initiate any calls to McDermet.  (Pl. Mem. at 6-9; Defs. Mem. at 6-7).  Therefore, they are not directly liable for any TCPA violations arising out of the calls that McDermet received.

The question is whether defendants may be held vicariously liable for any such violations.  A party "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers."  *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6584 (2013); *see also Campbell-Ewald Co. v. Gomez,* 577 U.S. 153, 168

(2016) (stating that "the Ninth Circuit deferred to [the FCC's decision] and we have no cause to question it").  Thus, a party "may be liable for [TCPA] violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification."  *In re DISH Network*, 28 FCC Rcd. at 6584.

McDermet contends that a party may also be held vicariously liable if it "provide[s] substantial assistance or support to any [seller or] telemarketer" that it "knows or consciously avoids knowing . . . is" violating federal telemarketing regulations.  (Pl. Mem. at 7 (quoting 16 C.F.R. § 310.3(b)).  But that standard is part of the Federal Trade Commission's Telemarketing Sales Rule ("TSR"), which is different from the TCPA.  *See* 16 C.F.R. § 310.3(b).  A private right of action exists for violations of the TSR, 15 U.S.C. § 6104, but McDermet has not pursued any such claims here.[7]  Accordingly, whether defendants may be held vicariously liable for any TCPA violations is governed not by the standard set forth in the TSR, but by common-law principles of agency.  *See In re DISH Network*, 28 FCC Rcd. at 6584.

Here, that analysis focuses on the four authorized retailers that apparently interacted with McDermet.  (*See* Haley Decl. ¶¶ 7-10).  While defendants do hire other companies expressly to telemarket to consumers, there is no evidence that those companies ever called McDermet.  (*See* Bailey Aff. ¶¶ 2-3).  Therefore, the question is whether the authorized retailers made any telemarketing calls to McDermet as agents of defendants, acting within the scope of their actual or apparent authority, or if defendants ratified their interactions with McDermet.  *See In re DISH Network*, 28 FCC Rcd. at 6584.  Ordinarily, the question of whether an agency relationship exists

---

[7] Indeed, it appears unlikely that he could sue under the TSR for the calls at issue.  Federal law provides a private right of action for TSR violations only where the plaintiff alleges "actual damages of $50,000 or more." *Shostack v. Diller*, 2016 WL 958687, at *6 (S.D.N.Y. Mar. 8, 2016).  Here, McDermet has not alleged any actual damages.  (Defs. Mem., Ex. 9 at 6; McDermet Dep. at 36).

is a "question of fact for the jury," but a court may find that no such relationship exists if there is no genuine issue of material fact. *See White's Farm Dairy, Inc. v. De Laval Separator Co.*, 433 F.2d 63, 66 (1st Cir. 1970).

### (1)    **Actual Authority**

"An essential element of agency is the principal's right to control the agent's actions." RESTATEMENT (THIRD) OF AGENCY § 1.01 cmt. f.  "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* Actual authority is an agent's power to act based on the principal's manifestations to the agent. *Id.* § 2.01; *see Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 37 n.6 (1st Cir. 2011).  Actual authority can be express or implied. *See* RESTATEMENT (THIRD) OF AGENCY § 2.01 cmt. b.  Express authority "means actual authority that a principal has stated in very specific or detailed language." *Id.*  Implied authority is actual authority based on an agent's reasonable interpretation of the principal's manifestations under the circumstances. *See id.*[8]

Here, there is no evidence that the authorized retailers had express authority to make any telemarketing calls to McDermet.  To the contrary, their contracts explicitly "prohibited [them] from outbound telemarketing . . . except via a manually placed return call or text message in response to a direct inquiry from a customer."  (*See, e.g.*, Haley Decl., Ex. B at Schedule 1). There is no indication in the record that they had received any direct inquiries from McDermet before calling him.  Furthermore, McDermet alleges that many of the calls he received used an

---

[8] Defendants contend that the authorized retailers lacked actual authority because they were not agents of defendants at all, but merely independent contractors.  (Defs. Mem. at 8-12); *see, e.g.*, *Jones v. Royal Admin Servs.*, 887 F.3d 443, 451-53 (9th Cir. 2018).  Because the Court concludes that even if the authorized retailers were defendants' agents for other purposes, they lacked the actual authority to engage in telemarketing, it does not reach that question.

ATDS, contained prerecorded messages, or ignored the national do-not-call registry, any one of which would appear to violate the terms of the authorized retailers' contracts.  (*See, e.g.*, *id.*). Thus, because any telemarketing calls that the authorized retailers made to him were in violation of the retailers' explicit instructions from defendants, those calls lacked express authority.  *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016) (holding telemarketer lacked express actual authority to send "4,849 faxes across three [] states" because it was only told to "send 100 faxes within 20 miles of Terre Haute"); *Helping Hand Caregivers, Ltd. v. Darden Rests., Inc.*, 2016 WL 7384458, at *4 (N.D. Ill. Dec. 21, 2016) (holding telemarketer lacked actual authority to conduct fax marketing because it was only told to advertise via e-mail).

Nor is there any evidence that the authorized retailers had implied authority to telemarket to McDermet.  Again, their contracts with defendants expressly prohibited any such calls and required them to comply with state and federal telemarketing laws.  (*See, e.g.*, Haley Decl., Ex. B at Schedule 1).  And there is no evidence in the record to suggest that defendants otherwise led them to reasonably believe that they should make telemarketing calls that might violate the TCPA.  To the contrary, the account managers who supervised the authorized retailers at issue have represented, without contradiction, that they never "encourage[d] or approve[d]" those retailers to make any outbound telemarketing calls.  (*See* Salerno Decl. ¶ 16; Loaiza Decl. ¶ 15; Charles Decl. ¶ 15).  Thus, based on the terms of their contracts and their interactions with defendants' employees, the authorized retailers, "could not have reasonably believed that [defendants] had given [them] authority to make calls to [McDermet] in violation of the TCPA." *See Kern v. VIP Travel Servs.*, 2017 WL 1905868, at *6 (W.D. Mich. May 10, 2017).

### (2)   <u>Apparent Authority</u>

"Apparent authority is the power held by an agent . . . to affect a principal's legal

15

relations with third parties when a third party reasonably believes the actor has authority to act

on behalf of the principal and that belief is traceable to the principal's manifestations."

RESTATEMENT (THIRD) OF AGENCY § 2.03.  Apparent authority can "be created only by the

*principal*'s manifestations to a third party," and is not established by only the purported "agent's

representations of authority to a third person."  *Moreau v. James River-Otis, Inc.*, 767 F.2d 6, 10

(1st Cir. 1985) (emphasis added) (citing RESTATEMENT (SECOND) OF AGENCY § 27).

      The FCC has identified "examples of evidence that may demonstrate that [a]

telemarketer" has "apparent authority [sufficient] to make [a company] vicariously liable for the

telemarketer's [TCPA] violations."  *In re DISH Network*, 28 FCC Rcd. at 6592.  "For example,

apparent authority may be supported by evidence that" (1) the company "allow[ed] the outside

sales entity access to information and systems that normally would be within [its] exclusive

control," such as "detailed information regarding the nature and pricing of [its] products and

services" or "customer information"; (2) the telemarketer could "enter consumer information

into [its] sales or customer systems"; (3) the telemarketer had "the authority to use [its] trade

name, trademark and service mark"; and (4) it "approved, wrote or reviewed the outside entity's

telemarketing scripts."  *Id.*  Some courts have noted the absence of those examples when

concluding that a telemarketer lacked apparent authority.  *See, e.g.*, *Rogers v. Postmates Inc.*,

2020 WL 1032153, *4 (N.D. Cal. Mar. 3, 2020); *Kern*, 2017 WL 1905868, at *7.

      However, those indicia are simply illustrative examples, rather than binding criteria.

"Numerous courts have concluded that the FCC's guidance . . . is not binding nor entitled to

deference."  *Krakauer v. Dish Network LLC*, 311 F.R.D. 384, 395 (M.D.N.C. 2015) (collecting

cases); *see also Dish Network, LLC. v. FCC*, 552 F. App'x 1, 2 (D.C. Cir. 2014) (per curiam)

("The FCC agrees that the 'guidance' in question has no binding effect on courts [and] is not

entitled to deference . . . ."); *Seri v. Crosscountry Mortg., Inc.*, 2016 WL 5405257, at *5 (N.D.

Ohio Sept. 28, 2016) (noting that the indicia are "neither a complete nor binding list of factors");

*United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1017-18 (C.D. Ill. 2014), *vacated in

part on reconsideration*, 80 F. Supp. 3d 917 (C.D. Ill. 2015).  The Court agrees that the FCC

factors are not entitled to deference and that common-law principles of apparent authority should

determine a defendant's vicarious liability under the TCPA.

Applying those principles, defendants cannot be held vicariously liable for the

telemarketing calls made to McDermet.  There is evidence in the record that McDermet believed

whoever called him "from DirecTV" had the authority to do so.  (*See* Pl. Mem., Exs. 5, 13, 15).

For example, on one call, McDermet asked a caller if he was "with DirecTV" and then, after the

caller responded that he was, declared his intent to sue DirecTV.  (Pl. Mem., Ex. 18).  A third

party's belief that a telemarketer has the authority to call on behalf of a principal must be

"traceable to the principal's manifestations."  *See* RESTATEMENT (THIRD) OF AGENCY § 2.03.

The question is thus whether McDermet's belief was traceable to any manifestations made by

defendants (the alleged principals), as opposed to representations of authority made by the callers

(the alleged agents).  *See Moreau*, 767 F.2d at 10.

To begin, there is no evidence that defendants directly indicated to McDermet that the

authorized retailers had their permission to telemarket to him.  It appears that he did not tell them

about the calls until February 2019, when he sent his demand letter.  (Defs. Mem., Ex. 7).  And

their response to that letter made it clear that they had not authorized the retailers to telemarket to

him.  First, their counsel stated in an e-mail to him that the authorized retailers were prohibited

by their contracts from making such calls.  (Defs. Mem., Ex. 8).  Then, defendants terminated

their contracts with three of the four authorized retailers that had apparently called McDermet,

and retained the fourth one only because it fired an independent contractor that it concluded had called McDermet.  (Haley Decl. ¶ 15).  In short, at no time did defendants ever directly manifest to McDermet that the authorized retailers were permitted to telemarket to him.

Nonetheless, authority can be traceable to the principal's manifestations "even when a principal did not directly communicate with a third party" when the principal makes "some outward manifestation" that is "at least visible to third parties" from which they could "trace their belief."  *Kristensen v. Credit Payment Servs. Inc.*, 2015 WL 4477425, at *5 (D. Nev. July 20, 2015).  McDermet contends that because defendants chose to contract with their authorized retailers, they are vicariously liable for all of those retailers' actions.  (Pl. Mem. at 10).  However, the fact that defendants contracted with the retailers for various services does not, without more, establish such liability:  "[t]he fact that one party performs a service that facilitates the other's business does not constitute [an apparent authority] manifestation."  *See Kristensen*, 2015 WL 4477425, at *5 (quoting RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. b).  Therefore, under common-law agency principles, McDermet has not offered sufficient evidence for a rational factfinder to find that the authorized retailers had apparent authority to telemarket to him as defendants' agents.

Moreover, even taking the FCC's indicia into account to determine vicarious liability, the record still does not include sufficient evidence to enable that finding.  Three of the FCC's indicia are arguably present here, but they provide only relatively weak support for a finding of apparent authority.  First, there is some evidence that the retailers had "access to detailed information regarding the nature and pricing of [defendants'] products and services."  *In re DISH Network*, 28 FCC Rcd. at 6592.  On several occasions, McDermet's callers quoted price and service information of the type that was presumably within defendants' exclusive control.  (*See,*

*e.g.*, Pl. Mem., Exs. 4, 15).  Access to that type of information, however, is not dispositive.  *See Rogers*, 2020 WL 1032153, at *4 (finding the fact that a telemarketer who, while advertising an employment opportunity with the defendant, told a plaintiff the defendant's hourly pay rate and geographic area of operation did not support the theory that the telemarketer had apparent authority as an agent of the defendant because that information could easily be found on the defendant's website or made up).

Second, it appears that the authorized retailers could "enter consumer information into [defendants'] sales or customer systems."  *In re DISH Network*, 28 FCC Rcd. at 6592.  That is evidenced by the fact that DirecTV apparently sent McDermet service information addressed to fake names that he gave to the authorized retailers.  (*See, e.g.*, Pl. Mem., Exs. 60, 61).  The retailers' contracts also indicate that they could access defendants' sales or customer systems. (*See, e.g.*, Haley Decl., Ex. B at § 2.2).[9]

Third, the retailers were permitted to use DirecTV's trademarks, trade names, and service marks, although their contracts specifically prohibited them from "hold[ing] themselves out as any AT&T Affiliates, including [DirecTV]," and required them to "prominently identify themselves in all marketing."  (*See, e.g.*, Haley Decl., Ex. B at § 8.1, Schedule 1).  The fact that the authorized retailers could use defendants' trademarks is not sufficient to establish apparent authority.  *Gonzalez v. Walgreens Co.*, 878 F.2d 560, 562 (1st Cir. 1989); *see also Theos & Sons, Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 746 (2000); *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL

---

[9] Notably, those contracts make it clear that the authorized retailers were prohibited from using those resources for telemarketing purposes.  (*See, e.g.*, Haley Decl., Ex. B. at Schedule 2 (noting that the provision of log-on credentials to applicable DirecTV service ordering systems was subject to the terms and conditions of the main agreement, which prohibited telemarketing)).  Those limitations were not known to McDermet, and the authorized retailers' "apparent authority does not disappear" solely because of "the existence of [those] undisclosed limits." *See* RESTATEMENT (THIRD) OF AGENCY § 3.03 cmt. b.  But this factor alone is not sufficient to support a reasonable finding that the authorized retailers had apparent authority to telemarket on defendants' behalf.

19

3526253, at *9 (C.D. Cal. May 18, 2015) (finding that a home security system distributor's "authority to use [a manufacturer's] trade name, trademark, and service mark" did not create apparent authority for it to telemarket on the manufacturer's behalf).

 As to the final factor, there is no evidence that the authorized retailers used telemarketing scripts that defendants approved, wrote, or reviewed.  To the contrary, defendants' account managers have testified that they never "require[d] [the authorized retailers] to distribute any particular marketing materials or message, or engage in any specific marketing at all."  (Salerno Decl. ¶ 12; Loaiza Decl. ¶ 11; Charles Decl. ¶ 11).  Similarly, they testified that they never gave the authorized retailers any telephone numbers of potential customers.  (Salerno Decl. ¶ 13; Loaiza Decl. ¶ 12; Charles Decl. ¶ 12).  Taken together, the evidence does not support a finding that the authorized retailers had the apparent authority to telemarket on defendants' behalf.

 Other courts have reached the same conclusion under similar circumstances.  For example, in *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765 (N.D. Ill. 2014), the court held that the plaintiffs had "fail[ed] to plead a plausible basis for holding" two defendants, "Nationwide or Farmers[,] liable under an apparent authority theory."  *Id.* at 777-79.  It did so even though the plaintiffs had alleged that—as here—a telemarketer had access to the defendants' price and service information, order systems, and trademarks.  *Id.* at 778.  The court reasoned that the plaintiffs "d[id] not trace any belief they may have [had] about an agency relationship between Farmers and [the telemarketer] to a manifestation of Farmers . . . rather than a representation made by" the telemarketer.  *Id.*  Accordingly, it held that under common-law principles, and notwithstanding the FCC's guidance, those allegations were insufficient to establish apparent authority.  *Id.*  In *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727 (N.D. Ill. 2014), the court reached the same conclusion on a similar record.  *See id.* at 744-45.  *But see Mey*

20

*v. Monitronics Int'l, Inc.*, 959 F. Supp. 2d 927, 932 (N.D.W. Va. 2013) (holding that telemarketers had apparent authority because they could hold themselves out as "authorized dealers"). [10]

In summary, a rational factfinder could not reasonably conclude on this record that defendants conferred apparent authority on the authorized retailers to telemarket to McDermet.

### (3)     Ratification

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). "Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts." *Licata v. GGNSC Malden Dexter LLC*, 466 Mass. 793, 802 (2014) (quoting *Linkage Corp. v. Trustees of Bos. Univ.*, 425 Mass. 1, 18 (1997)). "Ratification must be based upon full knowledge of all material facts, subject, however, to the qualification that there may be ratification when one purposely shuts his eyes to means of information within his own possession and control, and ratifies an act deliberately." *Id.* (quoting *Kidder v. Greenman*, 283 Mass. 601, 615 (1933)).

Defendants contend that they cannot be held vicariously liable under a ratification theory for any TCPA violations by the authorized retailers. (Defs. Mem. at 14-15). McDermet does not seem to dispute that; he contends only that they may be held liable under a theory of apparent authority. (Pl. Mem. at 10). In any event, the record fails to establish that defendants ratified the actions of the retailers. Defendants' account managers have testified that they never authorized,

---

[10] Notably, *Mey* was "expressly 'reject[ed]' by another court in [its] district." *Knapp v. Sage Payment Sols., Inc.*, 2018 WL 659016, at *6 n.4 (N.D. Cal. Feb. 1, 2018) (citing *In Re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 527-28 (N.D.W. Va. 2016)).

approved of, or encouraged any outbound telemarketing on behalf of DirecTV by the retailers. (Salerno Decl. ¶ 16; Loaiza Decl. ¶ 15; Charles Decl. ¶ 15).  Furthermore, McDermet has offered no evidence that defendants were either aware of or "shut [their] eyes to" the retailers' conduct before he sent them his demand letter in February 2019.  *Licata*, 466 Mass. at 802; (Defs. Mem., Ex. 7).  After they received the letter and thus "full knowledge of all material facts," defendants investigated McDermet's claims and terminated their contracts with the offending authorized retailers.  *Licata*, 466 Mass. at 802; (Haley Decl. ¶ 15).[11]  Thus, defendants did not "acquiesce[] in the agent's action or fail[] promptly to disavow the unauthorized conduct after disclosure of material facts."  *Licata*, 466 Mass. at 802.

Therefore, the record does not contain evidence by which defendants can be found vicariously liable for the telemarketing calls made by the authorized retailers to McDermet under any agency theory.

> **b.**   **Whether the Calls Were Made to Phone Numbers on the Do-Not-Call Registry**

McDermet further contends that defendants acted unlawfully by calling both his residential landline and his cell phone when both numbers were listed on the Massachusetts and federal do-not-call registries.  (Am. Compl. ¶¶ 32-33).  As previously noted, it is unlawful to "initiate any telephone solicitation to" a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry."  47 C.F.R. § 64.1200(c)(2).  That includes cell-phone owners.  *See* 47 CFR § 64.1200(e).  McDermet has not moved for summary judgment on that claim.  Defendants' answer admits that their records indicate that McDermet's phone numbers were listed on those do-not-call lists.  (Answer ¶ 10).  Nonetheless, they have

---

[11] Defendants retained one of the authorized retailers, but only because the retailer fired the independent contractor that it concluded had called McDermet.  (Haley Decl. ¶ 15)

moved for summary judgment on this claim, contending that they cannot be held liable for the authorized retailers' calls.  (Defs. Mem. at 6-7).  As set forth above, no rational factfinder could find that defendants were directly or vicariously liable for any of the calls that McDermet received and for their corresponding TCPA violations.  Accordingly, summary judgment will be granted to defendants on this claim.

### c.    <u>Whether the Callers Used an ATDS</u>

The complaint also alleges violations of the TCPA because the authorized retailers used an ATDS.  (Am. Compl. ¶ 32, 34-35).  Defendants have moved for summary judgment on the claims under § 227(b) of the TCPA to the extent they concern calls that were allegedly made using that technology.

As set forth above, the TCPA "makes it unlawful to call a cell phone using" an ATDS. *ACA Int'l*, 885 F.3d at 693.[12]  Under the TCPA, an ATDS is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1).

That definition raises a "basic question":  "whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed" or whether "it [is] enough" that "the device can call from a database of telephone numbers generated elsewhere." *ACA Int'l*, 885 F.3d at 701.  Defendants contend that an ATDS must *itself* have the ability to generate random or sequential telephone numbers to be dialed, while McDermet contends that an ATDS need only be able to make calls from a stored list of telephone numbers generated elsewhere.  (Defs. Mem. at 17-19; Pl. Mem. at 11-12).

---

[12] To the extent that McDermet alleges violations of § 227(b) for calls allegedly made using an ATDS to his residential landline, those claims will be dismissed.  (*See* Am. Compl. ¶ 34 (alleging violations of § 277(b)(1)(A)(iii) on 57 occasions, including calls made to both his cell phone and residential landline)).  § 227(b)(1)(A)(iii) only prohibits, in relevant part, calls to a cell phone made using an ATDS.

Both sides have authority to support their position.  Indeed, multiple federal courts of appeals have recently disagreed on this exact issue.  The Third, Seventh, and Eleventh Circuits have held that an ATDS must *itself* have the ability to generate random or sequential telephone numbers.  *Gadelhak v. AT&T Servs. Inc.*, 950 F.3d 458, 463 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1310-11 (11th Cir. 2020); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018).  By contrast, the Second, Sixth, and Ninth Circuits have held that an ATDS need only be able to make calls from a stored list of telephone numbers generated elsewhere.  *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 580-81 (6th Cir. 2020); *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 287 (2d Cir. 2020); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018).  The Supreme Court recently granted a writ of certiorari to address this very question.  *See Duguid v. Facebook, Inc.*, 926 F.3d 1146, 1150 (9th Cir. 2019), *cert granted*, 141 S. Ct. 193 (2020).  This Court, in an earlier case, has taken the view that an ATDS need only be able to make calls from a stored list of telephone numbers generated elsewhere.  *Gonzalez v. Hosopo Corp.*, 371 F. Supp. 3d 26, 31-34 (D. Mass. 2019).

The Court need not reexamine that conclusion at this point.  The record here contains little evidence about what type of device was used to call McDermet.  Neither he nor defendants have offered any concrete evidence about how the callers acquired or dialed his number.  Furthermore, as set forth above, no rational factfinder could find that defendants were directly or vicariously liable for any of the calls that McDermet received and for their corresponding TCPA violations.  Accordingly, summary judgment will be granted to defendants on this claim.

### d.        Whether the Callers Used an Artificial or Prerecorded Voice

McDermet also alleges that several calls he received to his cell phone and residential landline began with a prerecorded message in violation of the TCPA.  (Am. Compl. ¶ 35); *see* 47

U.S.C. §§ 227(b)(1)(A)(iii) (cell phone), 227(b)(1)(B) (residential landline).[13]  McDermet has

moved for summary judgment on this claim.  (Pl. Mem. at 13-14).  Defendants have not moved

for summary judgment on this claim to the extent they are found to be vicariously liable for the

calls in the first place.  (Defs. Mem. at 15).  But as set forth above, no rational factfinder could

find that defendants were directly or vicariously liable for any of the calls that McDermet

received and for their corresponding TCPA violations.  Accordingly, summary judgment will be

granted to defendants on this claim.

### 2.       Caller ID Blocking Claims

In McDermet's memorandum in support of his summary judgment motion, he asserts that

defendants violated FTC and FCC regulations by "blocking" his caller ID.  (Pl. Mem. at 14); *see*

16 C.F.R. § 310.4(a)(8); 47 C.F.R. § 64.1601(e).  But he did not plead any violations of those

rules in his amended complaint.  (*See* Am. Compl. ¶¶ 31-35).[14]  Accordingly, his motion will be

denied to the extent that it seeks summary judgment on any claim for a violation of those

regulations.

### 3.       Claims under Mass. Gen. Laws ch. 159C

The Massachusetts Telemarketing Solicitation Act ("MTSA"), Mass. Gen. Laws ch.

159C, also regulates telemarketing calls to consumers.  Section 3 of the MTSA prohibits

---

[13] The amended complaint alleges a violation of 47 U.S.C. § 227(b)(1)(B), but only as to calls made to McDermet's cell phone, which that statute does not prohibit.  (Am. Compl. ¶ 35).  However, some of the calls McDermet includes within that alleged violation were made to his residential landline.  (*See* Am. Compl. ¶ 35; Pl. Mem. at 13-14; *see, e.g.*, Pl. Mem., Ex. 33).  The Court will construe the complaint as adequately alleging that illegal calls beginning with prerecorded messages were made to both his cell phone and residential landline.  The inclusion of 47 U.S.C. § 227(b)(1)(B) in the complaint paragraph constitutes "fair notice" to the defendants of the claim against them.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

[14] Moreover, it is unlikely that McDermet could assert a claim under either regulation.  The first, 16 C.F.R. § 310.4(a)(8), is part of the TSR.  And again, a private right of action exists for TSR violations only where the plaintiff alleges "actual damages of $50,000 or more."  *Shostack*, 2016 WL 958687, at *6.  Similarly, it is doubtful that a private right of action exists for violations of the second rule.  *See Meyer v. Cap. All. Grp.*, 2017 WL 5138316, at *17 (S.D. Cal. Nov. 6, 2017) (concluding that 47 C.F.R. § 64.1601(e) "does not create a private right of action").

"mak[ing] or caus[ing] to be made [] unsolicited telephonic sales call[s] to a consumer:  (i) if the consumer's name and telephone number appear on the then[-]current quarterly no[-]sales solicitation calls listing . . . or (iv) by use of a recorded message device."  Mass. Gen. Laws ch. 159C, § 3.  Section 4 of the MTSA provides that no telemarketer shall "intentionally cause to be installed or shall intentionally use a blocking device or service to circumvent a consumer's use of a call identification service or device."  *Id.* § 4.

McDermet does not appear to have moved for summary judgment on all of his MTSA claims.[15]  His memorandum in support of his motion does set forth factual allegations that several calls made by defendants' agents used a recorded message in violation of the statute.  (Pl. Mem. at 13-14).  However, while it mentions the MTSA provisions that prohibit telemarketers from calling a consumer who is on a do-not-call list or using a blocking device to circumvent a call identification service, it does not offer any factual support from the record as to why summary judgment on those alleged violations is warranted.  (*See* Pl. Mem. at 3-4).

Defendants, meanwhile, only briefly mention the MTSA claims in the memorandum in support of their motion.  They note that the MTSA and the TCPA contain similar prohibitions.  (*See* Defs. Mem. at 6 (noting that the TCPA "make[s] it against the law to 'initiate any call,'" and that the MTSA "similarly prohibits 'making' or 'caus[ing] to be made'" certain calls)).  They then spend most of the memorandum seeking summary judgment on the TCPA claims because they allege that they are not vicariously liable for the telemarketing calls, but do not appear to

---

[15] McDermet purportedly has moved for summary judgment on "Count I" and "Count II" of his complaint, which encompasses all of his claims.  (Pl. Mot. at 1).  However, summary judgment is only appropriate when "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[,] . . . admissions, interrogatory answers, or other materials" support the conclusion that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  Therefore, McDermet did not properly move for summary judgment on claims for which he provided no support for the contention that summary judgment is appropriate.

expressly address summary judgment on the MTSA claims.  However, in their opposition to McDermet's motion, they do explicitly ask for summary judgment in their favor on those claims, again contending that they are not vicariously liable for any unlawful telemarketing done by their authorized retailers.  (Defs. Opp. at 16-17).

Ordinarily, of course, such a perfunctory effort at summary judgment would be denied. Here, however, there appears to be no dispute that the scope of vicarious liability is the same under the MTSA and the TCPA.[16]  Accordingly, the Court will construe defendants' motion as including a motion for summary judgment on the MTSA claims.  *See United States v. Bradstreet*, 207 F.3d 76, 80 n.1 (1st Cir. 2000) (finding that it is proper for a court to look to the reply brief for clarification of a party's arguments).

As set forth above, no rational factfinder could find that defendants were directly or vicariously liable for any of the calls that McDermet received and for their corresponding TCPA violations.  By extension, defendants cannot be found liable for any MTSA violations stemming from the calls.  Accordingly, summary judgment will be granted to defendants on these claims.

### 4.      Claims under Mass. Gen. Laws ch. 93A

Defendants have moved for summary judgment on McDermet's claim under Mass. Gen. Laws ch. 93A, contending that (1) he failed to send a written demand letter as required by § 9(3); and (2) he cannot establish that he suffered any injury.  (Defs. Mem. at 19-20).[17]  McDermet

---

[16] Defendants specifically contend that the scope of vicarious liability under the MTSA is the same as under the TCPA.  (Defs. Opp. at 17 n.12).  McDermet has provided no argument to the contrary, and the Court has found no precedent suggesting that the scope of vicarious liability is different under the two statutes.  *Cf. McDermet v. Porch.com, Inc.*, 2019 WL 1619867, at *4 (finding the MTSA to be the TCPA's "state analog"); *Howard v. Town of Burlington*, 399 Mass. 585, 589 (1987) ("In construing Massachusetts statutes we are ordinarily guided by the construction given the parallel [f]ederal statute by the [f]ederal courts.").

[17] The amended complaint does not specify whether it alleges a violation of § 9 or § 11 of Mass. Gen. Laws ch. 93A.  Presumably, it intends to allege this violation under § 9, the provision that applies to consumers, because there is no allegation that any interaction occurred between McDermet and defendants "in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 11.

contends that he "properly informed DirecTV" of his Chapter 93A claim in a demand letter and that he has shown that DirecTV's telemarketers "often used deceit" when they called him.  (Pl. Mem. at 15).[18]  As set forth above, defendants cannot be held directly or vicariously liable for any of the telemarketing calls that McDermet received.  Therefore, any alleged unfair or deceptive practices performed by the telemarketers in violation of Mass. Gen. Laws ch. 93A cannot be attributed to defendants, and summary judgment will therefore be granted in their favor on this claim.  However, McDermet's Chapter 93A claim is also inadequate because he failed to make a written demand for relief and has failed to establish the existence of a cognizable injury.

### a.      Failure to Make Written Demand

A plaintiff alleging a claim under Mass. Gen. Laws ch. 93A, § 9 is required to provide a written demand for relief to the potential defendant no less than thirty days before filing suit. Mass. Gen. Laws ch. 93A, § 9(3).  This demand requirement "is not merely a procedural nicety, but, rather, 'a prerequisite to suit.'"  *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004) (quoting *Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 812 (1975)).  The purposes of this demand requirement are twofold:  (1) "to encourage negotiation and settlement" and (2) to "control . . . the amount of damages."  *McKenna v. Wells Fargo Bank, N.A.*, 693 F.3d 207, 218 (1st Cir. 2012); *Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 288 (1985).

> A demand letter under 93A must make clear that the claim arises under that statute, either through:  (1) any express reference to c. 93A; (2) any express reference to the consumer protection act; (3) any assertion that the rights of the claimants as consumers have been violated; (4) any assertion that the defendant has acted in an unfair or deceptive manner . . . ; (5) any reference that the claimants anticipate a settlement offer within thirty days . . . ; or (6) any assertion that the claimant will pursue multiple damages and

---

[18] It is unclear whether McDermet seeks summary judgment on his Chapter 93A claim in his favor or simply opposes summary judgment in favor of defendants.  (*See* Pl. Mem. at 15-16).  In any event, his motion will be denied to the extent that it seeks summary judgment on that claim.

legal expenses, should relief be denied.

*Costello v. Bank of America, N.A.*, 2014 WL 293665, at *4 (D. Mass. Jan. 27, 2014) (quoting *Cassano v. Gogos*, 20 Mass. App. Ct. 348, 350 (1985)).  In other words, "to qualify as a written demand under [Chapter] 93A, a letter must, in addition to defining the injury suffered and the relief sought, . . . contain some other signal [that] will alert a reasonably perceptive recipient . . . that the claimant intends to invoke the heavy artillery of [Chapter] 93A."  *Cassano*, 20 Mass. App. Ct. at 350-51.

Here, McDermet sent a letter to defendants more than thirty days before he initiated this action.  (*See generally* Defs. Mem., Ex. 7).  That letter asserts violations of state and federal do-not-call laws.  (*See id.*).  It contains no express reference to Chapter 93A or to any consumer protection law.  (*See id.*).  Nor does it assert that defendants acted in an unfair or deceptive manner.  (*See id.*).  The letter asserts that McDermet "anticipate[s] a settlement offer within" thirty-two days and indicates that he "will pursue multiple damages," but not legal expenses, "should relief be denied."  *Costello*, 2014 WL 293665, at *4; (*see* Defs. Mem., Ex. 7).  Thus, it does not even satisfy the most liberal of the six tests set forth above.  *See Cassano*, 20 Mass. App. Ct. at 350-51.[19]

Furthermore, a Chapter 93A demand letter must also "reasonably describe[] . . . the injury suffered."  Mass. Gen. Laws ch. 93A, § 9(3).  McDermet's letter does not assert that he has suffered any injury at all from the calls he received.  (*See* Defs. Mem., Ex. 7).  It is true that it alleges violations of his legal rights—namely, those created by state and federal do-not-call laws.

---

[19] Defendants contend that McDermet conceded that he had not satisfied Chapter 93A's demand requirement.  (Defs. Mem. at 20).  It is true that at his deposition, he could not identify "anything in the demand letter that informs DirecTV [that he was] alleging they violated Chapter 93A."  (McDermet Dep. at 90).  However, he did not clearly admit that he had failed to satisfy the demand requirement.  (*See id.* at 89-90).  And in his briefing, he expressly contends that his letter gave adequate notice of his Chapter 93A claim.  (Pl. Mem. at 15-16).

(*See id.*).  But it is not enough for a Chapter 93A letter simply to allege such violations; it must "reasonably describe[e]" the "injury suffered."  Mass. Gen. Laws ch. 93A, § 9(3); *Spring*, 394 Mass. at 288 (holding a demand letter inadequate because it alleged that a defendant had "breach[ed] the [plaintiff's] rights of privacy" but did not specify any resulting injury).  The letter is therefore inadequate to satisfy the requirements of Chapter 93A.

### b. <u>Lack of Injury</u>

McDermet also has not shown that he suffered a compensable injury, which further supports granting summary judgment on his Chapter 93A claim in defendants' favor.

A plaintiff suing under Chapter 93A "must allege and ultimately prove that she has, as a result [of the statutory violation], suffered a distinct injury or harm that arises from the claimed unfair and deceptive act."  *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 8 (1st Cir. 2017) (quoting *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 503 (2013)).  A violation of the TCPA, without more, is not sufficient.  *See Jones v. Experian Info. Sols., Inc.*, 141 F. Supp. 3d 159, 163-64 (D. Mass. 2015).

Here, McDermet has not presented any evidence that he suffered an actual injury from the calls he received.  There is no indication in the record that the calls themselves cost him any financial or physical harm to his property.  At his deposition, he speculated that they may have interfered with his work and cost him professional opportunities.  (McDermet Dep. at 35-36).  While it is theoretically possible that unwanted phone calls could have such effects, McDermet has not offered any evidence that it actually happened here.  Indeed, he testified that he could not identify any instances where he lost professional opportunities because of the calls he received, and he ultimately conceded that he has not "suffered any harm that [he] know[s] of."  (*Id.* at 36).  Accordingly, his failure to establish that he suffered a compensable injury further supports granting summary judgment on his Chapter 93A claim in defendants' favor.

### 5.        Claims Against The DirecTV Group

Finally, defendants contend that The DirecTV Group is not properly a defendant because it is merely "a holding company in the chain of ownership between [DirecTV] and its parent, AT&T Inc." (Defs. Mem. at 20). Indeed, there is no evidence in the record that The DirecTV Group had any involvement in the alleged telemarketing. Again, the parties agree that neither defendant—DirecTV nor The DirectTV Group—made any calls to McDermet. (Pl. Mem. at 6-9; Defs. Mem. at 6-7). Furthermore, and unlike DirecTV, there is no indication that The DirecTV Group had any business relationship with the authorized retailers who may have telemarketed to McDermet. As set forth above, those authorized retailers sold DirecTV's services pursuant to a contract with one of its affiliates. (Haley Decl. ¶¶ 6-7; *see, e.g.*, *id.*, Ex. B). By contrast, there is no evidence that they ever performed services for The DirecTV Group, which does not enter into contracts with any customers or provide any television services to them. (Phillips Decl. ¶ 4).

In short, based on this record, the only apparent connection of The DirecTV Group to this case is that as "a holding company in the chain of ownership" between DirecTV and AT&T, it has some ownership interest in DirecTV. (*See id.*). Even if DirecTV were liable for the authorized retailers' telemarketing calls, McDermet has not offered any reasons why the Court should disregard the ordinary rule that shareholders are not liable for the acts of the company— in other words, why it should "pierce the corporate veil." *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985). Accordingly, defendants' motion for summary judgment will be granted as to all claims against defendant The DirecTV Group, Inc.

## IV.    Conclusion

For the foregoing reasons,

1.        The motion to strike of defendants DirecTV, LLC, and The DirecTV Group, Inc.
is GRANTED to the extent that plaintiff seeks to use the disputed out-of-court

statements to prove the truth of the matters asserted therein, and is otherwise

DENIED.

2.       The motion for summary judgment of defendants DirecTV, LLC, and The

DirecTV Group, Inc. is GRANTED.

3.       The motion for summary judgment of plaintiff William McDermet is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  January 21, 2021                    Chief Judge, United States District Court